1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ELIA VIVEROS,                             )   CASE NO. CV 10-08593 MMM (Ex)
                                          )
            Plaintiff,                    )
                                          )
       vs.                                )   FINDINGS OF FACT AND
                                          )   CONCLUSIONS LAW
PATRICK R. DONAHOE,                       )
POSTMASTER GENERAL,                       )
                                          )
            Defendant.                    )
                                          )
                                          )
                                          )
_____   )

       This action was tried to a jury from May 29 to June 1, 2012.  On June 1, the jury returned

a verdict for plaintiff Elia Viveros on her claim for pregnancy discrimination in violation of Title

VII, as modified by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).[1]  The jury awarded

Viveros $225,000 in damages for emotional distress.[2]  On June 12, 2012, the parties stipulated

18, 2012, the parties filed a stipulation and a joint statement regarding damages, setting forth the

areas on which the parties agreed and the areas of disagreement concerning what further damages

_____

       [1]Verdict Form, Docket No. 124 (Jun. 1, 2012).

       [2]*Id.* at 3.

1    were appropriate.[3]  The parties subsequently filed a stipulation stating that there were no issues

2    of fact remaining in the matter, and that the remaining issues regarding damages could be resolved

3    on the basis of the papers provided.[4]  Having considered the evidence, the arguments of counsel,

4    and the record in this action, the court makes the following findings of fact and conclusions of law

5    pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6

7                                    **I.  FINDINGS OF FACT**

8            **A.      Background**

9    1.      At trial, Viveros argued that she was wrongfully terminated because she experienced a

10           high-risk pregnancy that required her to be on bedrest and not to work.[5]  The parties agree

11           that Viveros became a full-time, career employee of the United States Postal Service in

12           September 2000.[6]  At the time of her termination, Viveros worked as a "T-6 Carrier

13           Technician" at the Sherman Oaks Post Office.[7]

14   2.      Viveros was pregnant from late-2008 to mid-2009, and gave birth to her fourth child on

15           May 25, 2012.[8]

16

17

18

19   ─────────────────

20           [3]Stipulation Re: Damages ("Damages Stipulation"), Docket No. 142 (Jul. 18, 2012), Exh.
21   A (Joint Statement Re: Damages ("Joint Statement").

22           [4]Stipulation Vacating Damages Hearing ("Stipulation Vacating Hearing"), Docket No. 146
     (Jul. 23, 2012) at 1. The parties added that the evidence submitted along with their joint report
23   regarding damages should be treated as undisputed by the court. (*Id.*)

24           [5]Reporter's Transcript of Proceedings, Day 1 ("Day 1 Transcript"), Docket No. 134 (Jun.
25   19, 2012) at 111:20-112:5.

26           [6]Damages Stipulation, ¶ 12.

27           [7]*Id.*, ¶ 12.

28           [8]Final Pretrial Conference Order ("PTC Order"), Docket No. 110 (May 22, 2012) at 3-4.

                                              2

**B.      Back Pay and Benefits**

3.      The parties disagree regarding the amount of back pay to which Viveros is entitled. Viveros contends that back pay should be calculated from May 1, 2009 to the date judgment is entered, while Donahoe contends that back pay should be calculated from May 1, 2009 to May 1, 2012, to account for the time that Viveros would have taken after she gave birth on May 25, 2009.[9]  They agree, however, that Viveros' gross salary between May 1, 2009 and May 1, 2012 is $159,700.[10]  They also agree that Viveros' gross salary between May 2, 2012 and July 18, 2012 (the date the stipulation was filed) is $11,400, based on a salary of $150 per day.[11]

4.      The parties agree that, in addition to receiving her gross pay, Viveros would have worked 5.47 overtime hours per pay period between May 1, 2009 and the date of entry of judgment.[12]  They agree that her overtime pay would have been $3,787 from May 1, 2009 to May 1, 2010, $3,894 from May 1, 2010 to May 1, 2011, and $4,001 from May 1, 2011 to May 1, 2012.[13]  The parties also agree that Viveros' overtime from May 1, 2012 to the date the court enters judgment would have been $790.[14]

5.      Prior to her termination, Viveros was enrolled in the Federal Employees Health Benefits Program; the bi-weekly health insurance premiums were jointly paid by Viveros and the Postal Service.[15]  Viveros was enrolled in the Blue Cross and Blue Shield Service Benefits

---

[9]Damages Stipulation, ¶¶ 15-16.

[10]*Id.*, ¶ 17.

[11]*Id.*, ¶ 19.  The parties agree that Viveros' monthly salary after May 1, 2011 would have been $4,567 per month.  (*Id.*, ¶ 20.)

[12]*Id.*, ¶ 25.

[13]*Id.*

[14]*Id.*

[15]*Id.*, ¶ 29.

3

Plan under its "Standard Family" option.[16]  The parties agree that, between May 1, 2009 and July 18, 2012, Viveros' fringe benefit award, if any, should be predicated on a bi-weekly premium of $603.[17]  During that time, the Postal Service would have paid 76% of the bi-weekly premium ($460) and Viveros would have paid the remaining 24% ($143).[18] The parties agree that, if the court finds premiums recoverable between May 1, 2009 and July 18, 2012, the portion of the monthly health insurance premiums that the Postal Service would have paid on Viveros' behalf would total $38,640.[19]

6.    Similarly, with regard to Viveros' life insurance benefits, the parties agree that, prior to her termination, Viveros was enrolled in the Federal Employees' Group Life Insurance ("FEGLI") Program; her life insurance premiums were paid by the Postal Service.[20] Viveros was enrolled in the "S0 – Basic + 4x Option B" option.[21]  The parties agree that, between May 1, 2009 and July 18, 2012, Viveros' fringe benefit award, if any, should be predicated on an annual contribution by the Postal Service of $72 ($6 per month).[22] Between May 1, 2009 and July 18, 2012, the portion of monthly FEGLI premiums that the Postal Service would have paid on Viveros' behalf would have totaled $235.[23]

7.    Viveros contends that she is entitled to recover an hourly wage for the sick hours that she was unable to take, and that alternatively, she should be awarded a credit for the 332 sick

---

[16]*Id.*, ¶ 30.

[17]*Id.*, ¶ 31.

[18]*Id.*

[19]*Id.*, ¶ 32.

[20]*Id.*, ¶ 33.

[21]*Id.*, ¶ 34.

[22]*Id.*, ¶ 35.

[23]*Id.*, ¶ 36.

leave hours she would have accrued had she remained employed by the Postal Service.[24]
The parties agree that Viveros would have accrued 312 sick leave hours between May 1,
2009 and May 1, 2012,[25] and 20 hours between May 2, 2012 and July 18, 2012.[26]  The
Postal Service does not "cash out" sick leave upon an employees' separation from the
agency.[27]

8.    Viveros had accrued 171.42 hours of sick leave at the end of 2006, 7.46 hours at the end
of 2007, and 16 hours at the end of 2008.[28]

9.    Viveros contends that she is entitled to recover an hourly wage for annual leave hours she
was unable to take.[29]  Alternatively, she asserts that she is entitled to a credit for the annual
leave hours she would have accrued.[30]  The parties agree that Viveros would have accrued
160 hours of annual leave from May 1, 2009 to May 1, 2010, 160 hours from May 1,
2010 to May 1, 2011, 160 hours from May 1, 2011 to May 1, 2012, and 30 hours from
May 2, 2011 to July 18, 2012.[31]  Donahoe concedes that the Postal Service does "cash out"
annual leave upon an employee's separation from the agency.[32]

10.    Viveros had 16.07 hours of annual leave left at the end of 2006, -18 hours at the end of

---

[24]*Id.*, ¶ 39.

[25]*Id.*, ¶ 41.  This number is equal to 104 hours from May 1, 2009 to May 1, 2010; 104 hours from May 1, 2010 to May 1, 2011; and 104 hours from May 1, 2011 to May 1, 2012.

[26]*Id.*

[27]*Id.*, ¶ 40.

[28] eclaration of Catherine V. Meek ("Meek Decl."), Docket No. 144 (Jul. 18, 2012), ¶¶ 9-16; see also *id.*, Exhs. D2-D4 ("TACS Reports").

[29]*Id.*, ¶ 42.

[30]*Id.*

[31]*Id.*, ¶ 44.

[32]*Id.*, ¶ 43.

1    2007, and 0 hours at the end of 2008.[33]

2    11.   Federal employees who are covered under the Federal Employees' Retirement System

3          Retirement System ("FERS") have the opportunity to participate in the Thrift Savings Plan

4          ("TSP"), a retirement savings plan similar to 401(k) plans available to private sector

5          employees.[34]   The parties agree that Viveros is covered under FERS and was a TSP

6          participant prior to her termination.[35]   The parties stipulate that, prior to Viveros'

7          termination, she was contributing 10% of her pre-tax salary to her TSP account every

8          two-week pay period.[36]   The parties agree that, as a FERS employee, Viveros could have

9          received matching contributions from the Postal Service to her TSP account every pay

10         period depending on the amount of gross pay she contributed.   The first 3% would have

11         been matched dollar-for-dollar by the Postal Service.   The next 2% would have been

12         matched at 50 cents on the dollar.   Under this formula, when an employee contributes 5%

13         of her basic pay to a TSP account, the Postal Service makes a contribution equal to 4% of

14         the employee's pay.[37]   The parties stipulate that as a vested FERS employee, Viveros

15         would have been entitled to an additional automatic 1% gross pay contribution from the

16         Postal Service every pay period whether or not she contributed personally to her TSP

17         account.[38]   Thus, taking into account the automatic 1% contribution, the Postal Service

18         would have matched Viveros' TSP contributions dollar-for-dollar for the first 5% of her

19         contribution.[39]   Viveros contends that she is entitled to recover this 5% matching

20

21         [33]Meek Decl., ¶¶ 23-31; see also TACS Reports.

22         [34]Damages Stipulation, ¶ 45.

23         [35]Id., ¶ 46.

24
25         [36]Id., ¶ 47; Meeks Decl., Exh. D-6 ("Thrift Savings Plan History Report").

26         [37]Id., ¶ 48.

27         [38]Id., ¶ 49.

28         [39]Id., ¶ 50.

contributions to her TSP accounts from the Postal Service.  Donahoe contends that Viveros is entitled to recover only the automatic 1% gross pay contribution the Postal Service would have made because she was a vested FERS employee.[40]  Despite these differing positions, the parties agree that the amount the court awards, if any, should be predicated on the salary amounts set forth above.[41]  The parties also agree that the amount the court awards, if any, as contributions to Viveros' TSP account should be paid by the Postal Service directly to the Federal Retirement Thrift Investment Board, which administers the TSP.[42]

12.   The parties disagree as to whether the Postal Service is entitled to a back pay offset because Viveros was eligible for unemployment benefits.[43]  They stipulate, however, that given her salary prior to her termination, Viveros was eligible to receive weekly unemployment benefits of $450.[44]  They also agree that, between May 1, 2009 and May 1, 2012, Viveros was eligible to receive 99 weeks of unemployment benefits, totaling approximately $39,600.[45]

13.   As a federal entity, the Postal Service fully funds its former employees' unemployment claims through the federal government's Unemployment Compensation Fund for Federal Employees program.[46]  Though individual states administer the benefits by issuing former federal employees' benefit checks, the funds disbursed by the states are reimbursed by the

---

[40]*Id.*, ¶ 52.

[41]*Id.*, ¶ 53.

[42]*Id.*, ¶ 54.

[43]*Id.*, ¶ 55.

[44]*Id.*, ¶ 59.

[45]*Id.*, ¶ 62.

[46]Meeks Decl., ¶ 35.

1   Postal Service through state contracts with the U.S. Department of Labor.[47]  These facts

2   are undisputed by Viveros.[48]

3   14.   The parties agree that Viveros is entitled to appropriate pre-judgment interest.[49]

4   **C.   Front Pay/Reinstatement**

5   15.   The parties agree that, in lieu of awarding front pay, Viveros should be reinstated as a

6   Postal Service employee.[50]  They also agree that she should be reinstated as a T-6 Carrier

7   Technician.  If such position is no longer available, the parties stipulate that Viveros should

8   be reinstated to a position of a similar nature at the same salary as a T-6 Carrier

9   Technician.[51]  They also agree that she should be reinstated to the duty installation where

10  she was working before her termination.  If no positions are available at that location, the

11  parties stipulate that Viveros should be reinstated to a duty installation at or near her prior

12  installation.[52]  They further agree that in addition to reinstatement, Viveros will resume her

13  status as an eligible employee in the reimbursable uniform program and will be entitled to

14  all uniform allowances payable pursuant to the collective bargaining agreement.[53]  The

15  parties also stipulate that Viveros' seniority rights should not be reset or reduced and that

16  they will be assessed as if Viveros had been working continuously at her prior installation

17  from the time of her termination to the date of her reinstatement.  They further stipulate

18  that Viveros' reinstatement will include reinstatement of full retirement benefits and other

19  fringe benefits as if she had not separated from the Postal Service and as if she had worked

20  _____

21  [47]*Id.*, ¶ 36.

22  [48]Stipulation Vacating Hearing at 1.

23  [49]Damages Stipulation, ¶ 63.

24  [50]*Id.*, ¶ 64.

25  
26  [51]*Id.*, ¶ 66.

27  [52]*Id.*, ¶ 67.

28  [53]*Id.*, ¶ 68.

continuously for the Postal Service from the time of her termination to the date of her reinstatement.  The parties agree that any terms or conditions of employment that are based in whole or in part on duration of service or accrual of time worked, including without limitation benefit accrual calculations, retirement calculations, and seniority calculations, will be determined or calculated as if Viveros had not separated from the Postal Service and as if she had worked continuously for the Postal Service from the time of her termination to the date of her reinstatement.[54]  The parties also stipulate that Viveros' base salary upon reinstatement shall be $56,458, corresponding to a City Carrier Grade 2, Step Level "L" pay category.

16.   Any findings of fact that are deemed to be conclusions of law are incorporated herein as such.

## II.  CONCLUSIONS OF LAW

### A.      Legal Standards Governing Back Pay, Front Pay and Reinstatement

17.   Title VII of the Civil Rights Act of 1964 permits courts to grant equitable remedies to employees who have been subjected to impermissible discrimination by employers with fifteen or more employees.  See 42 U.S.C. § 2000e-5(g) (1994).  "The relevant remedies include reinstatement and awards of back pay and front pay."  *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2000).  "The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole."  *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995) (citing *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1448 (9th Cir. 1990)).  Title VII prohibits discrimination in employment "because of" sex.  42 U.S.C. § 2000e-2(b).  The Pregnancy Discrimination Act amended Title VII to state that "because of sex" includes pregnancy.  42 U.S.C. § 2000e(k); see also *Hoffman v. Lyons*, No. Civ. 08-5248 RBKKMW, 2009 WL 3029759, *8 (D.N.J. Sept. 15, 2009).

18.   "Back pay is calculated by subtracting the actual wages a discharged employee earned

---

[54] *Id.*, ¶ 69.

9

1    subsequent to termination from the amount the employee would have earned absent the

2    employer's discriminatory conduct." *E.E.O.C. v. Sunfire Glass, Inc.*, No.

3    CV-08-1784-PHX-LOA, 2009 WL 976495, *11 (D. Ariz. Apr. 10, 2009). It is typically

4    computed "from the date of the discriminatory act until the date of final judgment."

5    *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986). Back pay awards

6    "advance 'Congress' intent to make "persons whole for injuries suffered through past

7    discrimination."'" *Caudle*, 224 F.3d at 1020 (quoting *Loeffler v. Frank*, 486 U.S. 549,

8    558 (1988) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975));

9    *Kraszewski v. State Farm Gen. Ins. Co.*, 912 F.2d 1182, 1183-84 (9th Cir. 1990) (citing

10   *Albemarle Paper*, 422 U.S. at 417-20). Accordingly, "once a court finds unlawful

11   discrimination, backpay should be denied only if denial 'would not frustrate the central

12   statutory purposes of eradicating discrimination throughout the economy and making

13   persons whole for injuries suffered through past discrimination.'" *Thorne*, 802 F.2d at

14   1137 (quoting *Albemarle Paper*, 422 U.S. at 421)); see also *Caudle*, 224 F.3d at 1202;

15   *Odima*, 53 F.3d at 1495.

16   19.   In the Title VII context, the plaintiff bears the burden of proving damages. *Hance v.*

17   *Norfolk Southern Ry. Co.*, 571 F.3d 511, 519 -20 (6th Cir. 2009); *Rivera v. NIBCO, Inc.*,

18   384 F.3d 822, 832 (9th Cir. 2004) ("[C]ourts will award a damage remedy under Title VII

19   only where the plaintiff has proven he actually suffered the claimed loss"); *Horn v. Duke*

20   *Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985). Back

21   pay need not be proved to an exact, mathematical certainty, however. The wrongdoer

22   bears the risk of any uncertainty it has created. *Estate of Reynolds v. Dole*, No.

23   C–84–7012–VW(JSB),1990 WL 112283, *44 (N.D. Cal. Aug. 1, 1990); see also *Hance*

24   *v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) ("Backpay should be

25   awarded even where the precise amount of the award cannot be determined. Any

26   ambiguity in what the claimant would have received but for discrimination should be

27   resolved against the discriminating employer" (citation omitted)); *E.E.O.C. v. Freeman*,

28   No. 3:06–0593, 2011 WL 1226468, *3 (M.D. Tenn. Mar. 31, 2011).

20.     "Front pay is the term used to describe damages paid as [prospective] compensation for training or relocating to another position.  An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Caudle*, 224 F.3d at 1020 (quoting *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir. 1984), overruled on other grounds, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (alteration original)).

21.     "[R]einstatement, when it is feasible, is 'the preferred remedy' in a discrimination suit." *Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148, 1156 (9th Cir. 1999) (quoting *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1346 (9th Cir. 1987)). Nonetheless, "[a]wards of front pay are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties." *Thorne*, 802 F.2d at 1137 (citing *Fadhl*, 741 F.2d at 1167).

### B.     Calculation of Back Pay

22.     Viveros' gross salary from the time of her termination to the present is $191,800.[55] Donahoe acknowledges that back pay is typically computed from the date of the discriminatory act until the date of final judgment, but contends that the court should take into account the "post-delivery maternity leave that Plaintiff would have no doubt have taken after she gave birth on May 25, 2009."[56]  Donahoe assumes a two-month maternity leave following delivery; based on this assumption, he contends the court should deduct two months of Viveros' back pay.[57]  This number is entirely speculative.  Donahoe proffers no evidence supporting his assumption concerning the length of any maternity leave Viveros might have taken.  He does not, for example, adduce evidence of the length of

---

[55]This amount is the total of Viveros' gross pay from May 1, 2009 to May 1, 2012 ($159,700), the gross pay she would have received from May 2, 2012 to July 18, 2012 the date the stipulation was filed, and $150 per day for the period from July 19, 2012 to December 4, 2012. *Id.*, ¶¶ 17-18.

[56]Joint Statement at 1.

[57]*Id.* at 1-2.

11

1   maternity leave Viveros planned to take before she was terminated, nor concerning the

2   leave time she took following the births of her older children. *Metz v. Merrill, Lynch,*

3   *Pierce, Fenner and Smith*, No. CIV–89–1548–C, 1991 WL 355199, *7 (W.D. Okla. July

4   8, 1991) ("While it appears that plaintiff would not have earned full compensation from

5   Merrill Lynch during the time of her maternity leave, there has been no evidence regarding

6   the length or productivity of maternity leave and the Court will not speculate or reduce the

7   award absent supporting evidence"), overruled in part on other grounds in *Metz v. Merrill*

8   *Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482 (10th Cir. 1994). The court therefore

9   concludes that Viveros' hypothetical maternity leave does not warrant a reduction in the

10  amount of back pay to which the parties have agreed.

11  23.   The parties have stipulated that Viveros would have received $12,472 in overtime

12  payments from the date of her termination until the date of entry of judgment.[58] For the

13  reasons explained above, the court does not believe it is appropriate to subtract from this

14  sum a hypothetical time period during which Viveros would have been on maternity leave,

15  and therefore concludes that awarding the full amount of overtime is necessary to make

16  Viveros whole.

17  **C.     Calculation of Fringe Benefits**

18  24.   The parties dispute whether Viveros is entitled to recover the payments the Postal Service

19  would have made for her health and life insurance had she not been terminated. In,

20  *Galindo v. Stoody Co.*, 793 F.2d 1502 (9th Cir. 1986), the Ninth Circuit held that

21        "[w]here an employee's fringe benefits include medical and life

22        insurance, a plaintiff should be compensated for the loss of those

23        benefits if the plaintiff has purchased substitute insurance coverage

24        or has incurred, uninsured, out-of-pocket medical expenses for which

25        he or she would have been reimbursed under the employer's

26        insurance plan." *Id.* at 1516-17.

27  _____

28  [58]Damages Stipulation, ¶ 25.

12

The Ninth Circuit applied this holding to a Title VII case in *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 902 (9th Cir. 994). Despite conceding that "the method of calculating damages set forth in *Galindo* disadvantages those who cannot afford to pay insurance premiums after being discharged," the court concluded that it was bound by the precedent in *Galindo*, and remanded the case to the district court "with instructions to calculate Estrada's lost health and life insurance benefits based on her out-of-pocket expenses." *Id.*

25.  Viveros argues that, in cases in which the aggrieved employee's failure to obtain replacement health and life insurance is due to an inability to afford it rather than a lack of desire for it, the proper calculation of damages is the cost to the employer of the insurance premiums.[59] As support, plaintiff cites a number of non-Ninth Circuit cases, as well as *Richardson v. Restaurant Marketing Associates, Inc.*, 527 F.Supp. 690, 698 (N.D. Cal. 1981). The *Richardson* court held that the proper calculation of plaintiff's lost insurance benefits is the amount the employer "would have contributed to the union Health and Welfare fund . . . [because the] [f]ailure by plaintiffs to buy replacement coverage was due to an inability to afford such coverage rather than a lack of desire for it." *Richardson* preceded both *Galindo* and *Farmer Bros Co.* Indeed, in applying *Galindo*'s holding in the Title VII context, the Ninth Circuit expressly cited *Richardson* and reached a contrary result. See *Farmer Bros. Co.*, 31 F.3d at 902 n. 8.[60] The court is bound by both *Galindo* and *Farmer Bros. Co.* Given those decisions, it concludes that *Richardson* is not an accurate statement of the law in the circuit.[61]

---

[59]Joint Statement at 3.

[60]Viveros argues that "*Farmer Bros. Co.* explicitly preserves the *Richardson* exception for employees unable to afford replacement insurance." (*Id.* at 5.) This is not a plausible reading of the Ninth Circuit's decision. Indeed, it is clear that the Ninth Circuit noted the decision in *Richardson*, and found that the court's reasoning had some merit, but nonetheless concluded that it was bound by the contrary decision in *Galindo*.

[61]Viveros attempts to distinguish *Galindo* by limiting its application to its facts – i.e., to fair representation suits by an employee against his union. (Joint Statement at 4-5.) The fact that it involved a different factual context, however, did not prevent the court in *Farmer Bros. Co.*

13

26.     Viveros does not adduce evidence that she purchased substitute insurance coverage or that she incurred uninsured, out-of-pocket medical expenses for which she would have been reimbursed under the Postal Service's insurance plan.  Consequently, she has proffered no evidence that payment of fringe benefits is necessary to make her whole.  *Farmer Bros. Co.*, 31 F.3d at 902; *Galindo*, 793 F.2d at 1516-17.  The court therefore declines to award fringe benefit payments.

### D.     Calculation of Annual Leave

2.     The parties disagree as to whether Viveros is entitled to compensation for the annual vacation hours she would have accrued had she not been terminated.  Viveros contends she is entitled to recover an hourly wage for all the vacation hours she was unable to take between May 1, 2009 and July 17, 2012, while Donahoe contends that Viveros would have used all her vacation hours during this period, and therefore would have had no annual leave to "cash out."[62]

28.     In *Local 2750, Lumber and Sawmill Workers Union, AFL-CIO v. Cole*, 663 F.2d 983 (9th Cir. 1981), the Ninth Circuit remanded a case to the district court to award damages for four weeks of vacation pay, which it concluded were necessary to make the employee whole.  *Id.* at 987; see also *United States v. Burke*, 504 U.S. 229, 239 (1992) (listing vacation pay as one of the amounts recoverable for being wrongfully discharged on the basis of sex), superceded by statute on other grounds by The Small Business Protection Act of 1996, Pub.L. No. 104–188, § 1605, 110 Stat. 1838.

29.     Viveros proffers no evidence that she would not have used her annual leave hours had she

---

from applying *Galindo*'s holding in a Title VII suit.  Viveros argues that *Farmer Bros. Co.* is itself distinguishable, since the court there "relied solely on *Galindo* for its finding and [the case] is therefore distinguishable from the present case to the extent *Galindo* is factually and legally distinguishable."  (Joint Statement at 5.)  This argument is unconvincing.  The court in *Farmer Bros. Co.* applied *Galindo* despite the factual differences between the cases.  The court is bound by *Farmer Bros. Co.*'s conclusion that the *Galindo* rule applies, particularly given that *Farmer Bros Co.* is not meaningfully distinguishable from this case.  *Farmer Bros. Co.*, 31 F.3d at 902.

[62]Joint Statement at 8-10.

not been wrongfully terminated.  Nor indeed does she even advance such an argument. Evidence of Viveros' work history with the Postal Service indicates that she always used much of her annual leave, and during two years, used all of the hours allotted or more than the hours allotted.[63]  Absent evidence and argument that she would not have used her annual leave hours had she been working for the Postal Service, awarding Viveros compensation for annual leave would amount to mere speculation.  See *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 900 (1984) ("[I]t remains a cardinal, albeit frequently unarticulated assumption, that a backpay remedy must be sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices"); *McKenna v. City of Philadelphia*, 636 F.Supp.2d 446, 459 (E.D. Pa. 2009) (finding "banked" vacation and sick time too speculative to support a back pay award, despite plaintiff's claim that he would not have used any of the time that would have accrued during the back pay period).  Consequently, the court concludes that Viveros is not entitled to an award of compensation for annual leave.

### E.    Calculation of Sick Leave

30.   The parties similarly disagree as to whether Viveros is entitled to recover an amount for the sick leave hours she would have accrued had she not been terminated.[64]  Donahoe contends that sick leave cannot be awarded because it is not "cashed out" at the conclusion of employment.[65]   The court agrees that awarding Viveros monetary damages for sick leave hours she was unable to use after her termination would result in a duplicative monetary award, given the Postal Service's no cash out policy and the court's decision to award plaintiff back pay based on her monthly salary.  Such an award would do more than reinstate Viveros to the position she would have been had the discriminatory act not occurred, since under no circumstance would Viveros have been entitled to be financially

---

[63]Meek Decl., ¶¶ 23-31; see also TACS Reports.

[64]Joint Statement at 11-12.

[65]*Id.* at 12.

compensated for accrued sick leave hours had she remained at the Postal Service.   See *Naton v. Bank of California*, 649 F.2d 691, 700 (9th Cir. 1981) (declining to award the monetary value of sick leave hours when the employer's "policy did not permit sick leave or vacation benefits to be 'cashed out,' [and required] that a retiring employee . . . use the accrued benefits by ceasing to work prior to the retirement date").   For these reasons, the court declines to award Viveros the monetary value of the sick leave hours she would have accrued subsequent to her termination.

31.   Viveros contends, in the alternative, that she should receive a sick-time credit upon reinstatement.[66]   As with annual leave, however, Donahoe proffers evidence that Viveros often used most of the sick leave she was allotted.[67]   Viveros does not adduce evidence, or even argue, that she would not have taken sick leave had she remained a Postal Service Employee.   She has therefore not met her burden of proving damages.   As a result, any time credit award would be based on speculation.   See *McKenna*, 636 F.Supp.2d at 459. Consequently, the court declines to award any such credit.

## F.     Calculation of Thrift Savings Plan Contribution

32.   Viveros argues that she is entitled to the value of the 5% matching contribution the Postal Service would have made had she contributed 10% of her gross income to her TSP account.[68]   The parties agree that Viveros consistently contributed 10% of her salary each pay period prior to termination to her TSP account.[69]   Donahoe argues that Viveros is only entitled to the 1% contribution the Postal Service would automatically have contributed to Viveros' TSP account whether or not she made personal contributions.[70]   The evidence,

---

[66]*Id.* at 11.

[67]Meek Decl., ¶¶9-16; see also TACS Reports.

[68]Joint Statement at 14.

[69]See Thrift Savings Plan History Report.

[70]Joint Statement at 15.

however, indicates a consistent pattern of contributions by Viveros.   Donahoe has proffered nothing suggesting that Viveros would have stopped making contributions that would have triggered the maximum matching contribution by the Postal Service had she remained employed.  The court, therefore, that the Postal Service must make the matching contributions to the TSP account it would have made had Viveros contributed 10% of her salary to her TSP account in order to make Viveros whole.[71]

33.   The court therefore awards Viveros an amount equivalent to 5% of the gross pay she would have received from the time of her termination to the date of judgment, or $9,590. The parties agree that this amount should be paid by the Postal Service directly to the Federal Retirement Thrift Investment Board, which administers the TSP, and the court so orders.[72]

### G.   Unemployment Benefits

34.   The parties disagree as to whether the Postal Service is entitled to a back pay offset due to Viveros' eligibility for unemployment benefits.[73]   Under the collateral source rule, "benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." 1 Dan B. Dobbs, LAW OF REMEDIES § 3.8(1) at 372-73 (2d ed. 1993); accord *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 346-47 (9th Cir. 1982). The primary justifications for the collateral source rule are that the defendant should not get a windfall for collateral benefits received by the plaintiff and that

---

[71]Donahoe suggests that awarding Viveros 5% of her gross income as a TSP account contribution would give Viveros a windfall, since Viveros would have had to contribute at least 5% of her gross pay to receive the contribution, and that "in this context, [such a payment] would come out of her back-pay award." (Joint Statement at 15.) This reasoning is flawed, as it rests on the premise that the money Viveros contributed to the TSP account was no longer hers. That is not the case. The TSP is a retirement savings plan. Any money Viveros would have contributed had she not been wrongfully terminated would have remained in the account for her use later. As a result, the court need not lower Viveros' back pay award to prevent her from receiving a windfall as a result of the Postal Service's TSP account contribution.

[72]Damages Stipulation, ¶ 54.

[73]*Id.*, ¶ 55;

the defendant should not profit from benefits for which the plaintiff has herself paid.  See, e.g., *Siverson v. United States*, 710 F.2d 557, 560 (9th Cir.1983); *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir.1962) ("As between the injured person and the tortfeasor, the former's claim is the better. . . .  The tortfeasor bears only the single burden for his wrong.  That burden is imposed by society . . . to deter" wrongful conduct).

35.  Ninth Circuit precedent is not clear as to whether a district court has discretion to deduct collateral benefits from a damages award under Title VII.  Compare *Kauffman*, 695 F.2d at 347 ("We . . . hold that unemployment benefits received by a successful plaintiff in an employment discrimination action are not offsets against a [Title VII] back pay award") with *Naton*, 649 F.2d at 700 (holding that the district court had discretion to deduct collateral benefits from an ADEA back pay award); see also *Lussier v. Runyon*, 50 F.3d 1103, 1109 (1st Cir.1995) (concluding that *Kauffman* and *Naton* reflect "an internal division" in the Ninth Circuit as to whether district courts have discretion to deduct collateral benefits from damages awards under the anti-discrimination statutes); *McLean v. Runyon*, 222 F.3d 1150, 1155-56 n. 7 (9th Cir. 2000) (recognizing the tension in past authority).

36.  In *McLean*, the Ninth Circuit analyzed the damages awarded to a Postal Service employee who was subjected to disability discrimination, and the district court's decision to reduce his front and back pay award due to the workers' compensation benefits he received under the Federal Employees Compensation Act ("FECA").  *McLean*, 222 F.3d at 1152.  The court concluded that the collateral source rule did not apply, since workers' compensation benefits under FECA are ultimately paid by the Postal Service, and thus are not derived from a collateral source.  *McLean*, 222 F.3d at 1156 (explaining that "FECA workers' compensation benefits are paid from an Employees' Compensation Fund (ECF), which is ultimately reimbursed entirely by the appropriate federal agency or instrumentality for each payment made for an injury to one of its employees. See 5 U.S.C. § 8147.  There is no windfall to USPS if McLean's FECA benefits are offset from his damages award because USPS pays both the damages award and the workers' compensation benefits"); *Stratton v.*

18

*Dep't for the Aging for the City of New York*, 922 F.Supp. 857, 866 (S.D.N.Y. 1996) (deducting unemployment compensation from the plaintiff's back pay award because the defendant was a government agency and therefore, the City of New York was effectively the entity, which provided plaintiff's unemployment benefits); *Williams v. Sec'y of the Navy*, 853 F.Supp. 66, 72 (E.D.N.Y. 1994) (deducting unemployment compensation from plaintiff's back-pay award because the Navy Exchange reimburses the Federal Employees Compensation Account in an amount equal to unemployment compensation paid to its employees).

37.   The Postal Service fully funds its former employees' unemployment claims through the federal government's Unemployment Compensation Fund for Federal Employees program,[74] and reimburses the states for any unemployment benefits they pay.[75]   As a result, the collateral source rule does not apply, since the unemployment benefits Viveros received were ultimately paid by the Postal Service.   *McLean*, 222 F.3d at 1156.   There is no windfall to the Postal Service if the unemployment payments offset Viveros' damage award, since the Postal Service pays both the damage award and unemployment benefits.

38.   Viveros argues that the state of California can seek reimbursement of unemployment benefits she received based on the back pay award, and that it would be unfair to require her to reimburse both the state and the Postal Service for the benefits.[76]   The statutory provision Viveros cites for this proposition, however, is California Unemployment Insurance Code § 1382,[77] which states:

> "No person shall be liable for the amount of benefits received for any
> period for which the person also received an award or settlement of

---

[74]Meeks Decl., ¶ 35.

[75]Stipulation Vacating Hearing at 1.

[76]Joint Statement at 17-18.

[77]*Id.* at 17.

19

backpay resulting from an action or grievance for wrongful discharge, if the amount of the backpay award or settlement was reduced by the amount of benefits received pursuant to this part. When the amount of the backpay award or settlement was reduced by the amount of benefits received, the employer shall pay to the Unemployment Fund an amount equal to the amount subtracted from the backpay award or settlement for benefits received by the person in order to reimburse the fund.   When an individual has been awarded or receives backpay, the amount of the backpay shall constitute wages paid in the period for which it is awarded."

The statute makes clear that the state is not entitled to reimbursement for benefits paid when the back pay award has been reduced to account for those benefits.   Additionally, even if a repayment was due, it would come from the Postal Service, not Viveros. Consequently, the statute provides no basis for declining to offset unemployment benefits against the back pay award.

39.   For the reasons stated, the court concludes that Viveros' back pay award should be reduced by the amount of unemployment benefits available to her during her period of unemployment, which the parties agree is $39,600.[78]

**H.   Availability of Reinstatement**

40.   As noted, "reinstatement, when it is feasible, is 'the preferred remedy' in a discrimination suit." *Gotthardt*, 191 F.3d at 1156.   The parties stipulate Viveros should be reinstated as a T-6 Carrier Technician, and have agreed in detail to the terms under which she will resume work.[79]   Given this agreement, the court concludes that reinstatement is the appropriate remedy.

**I.   Interest**

---

[78]Damages Stipulation, ¶¶ 58, 62.

[79]Damages Stipulation, ¶¶ 63-69.

20

41.   While the parties agree that Viveros is entitled to prejudgment interest, they do not set forth a method for calculating this interest.[80]  "An award of prejudgment interest on a back pay award is appropriate." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984).  The interest rate used to calculate prejudgment interest is within the discretion of the trial judge. *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir. 1984).  This discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty.  *Id.*; *Jung v. Potter*, No. CV 04-429-PHX-MHM, 2008 WL 2620905, *6 (D.Ariz. July 1, 2008).  In calculating prejudgment interest, the court will use the weekly average 1-year constant maturity Treasury yield.  See *id.*; see also *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007)  ("Generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate,'" quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163-64 (9th Cir. 2001)), and calculate interest at the date of judgment.  For the week ending November 30, 2012, the applicable interest rate was 0.16%, yielding prejudgment interest of $278.82.

42.   Although neither party discussed the issue of post-judgment interest, "[u]nder the provisions of 28 U.S.C. § 1961, postjudgment interest on a district court judgment is mandatory." *Air Separation, Inc. v. Underwriters at Lloyd's of London*, 45 F.3d 288, 290 (9th Cir. 1995) (citing *Perkins v. Standard Oil Co.*, 487 F.2d 672, 674 (9th Cir. 1973)).  Post-judgment interest applies to the entire judgment, including principal, prejudgment interest, attorneys' fees, and costs. *Id.* at 291.  The post-judgment interest rate is set "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." 28 U.S.C. § 1961(a).  Accordingly, the court will award

---

[80]Damages Stipulation, ¶ 63.

1    post-judgment interest at 0.16% per year.

2  43.  Any conclusions of law that are deemed to be findings of fact are incorporated herein as

3    such.

4

5                              **III.   CONCLUSION**

6          For the reasons stated, the court concludes that Viveros is entitled to $152,200 in back

7  pay,[81] $12,472 in overtime payments, $9,590 in TSP contributions, to be paid by the Postal

8  Service directly to Viveros' account via Federal Retirement Thrift Investment Board, $278.82 in

9  prejudgment interest, and post-judgment interest of 0.16% per year.   The court will enter

10 judgment for these amounts and for the $225,000 in emotional distress damages awarded by the

11 jury.

12         The court orders that Viveros be reinstated as a Postal Service employee, and that she be

13 reinstated as a T-6 Carrier Technician.  If such a position is no longer available, the court orders

14 that Viveros be reinstated to a position of a similar nature at the same salary as a T-6 Carrier

15 Technician.   The court orders that Viveros be reinstated to the duty installation where she worked

16 prior to her termination.   If no positions are available at such installation, Viveros shall be

17 reinstated to a duty installation at or near her prior installation.  Upon reinstatement, Viveros shall

18 resume her status as an eligible employee in the reimbursable uniform program and shall be

19 entitled to all uniform allowances payable pursuant to the collective bargaining agreement.

20         As the parties have agreed, the court orders that Viveros' seniority rights not in any way

21 be reset or reduced and that they shall be assessed as though Viveros had been working

22 continuously at her prior installation from the date of her termination to the date of her

23 reinstatement.   Viveros' reinstatement shall include reinstatement of full retirement benefits and

24 other fringe benefits as though Viveros had not separated from the Postal Service and had worked

25 continuously for the Postal Service from the date of her termination to the date of her

26

27         [81]This amount is equal to the total back pay which Viveros would have received, minus the

28 $39,600 of unemployment benefits available to her during her period of unemployment.

reinstatement.  Any terms or conditions of employment that are based in whole or in part on duration of service or accrual of time worked, including without limitation, benefit accrual calculations, retirement calculations, and seniority calculations, shall be determined or calculated as though Viveros never separated from the Postal Service and worked continuously for the Postal Service from the date of her termination to the date of her reinstatement.  Viveros' base salary upon reinstatement shall be $56,458, corresponding to a City Carrier Grade 2, Step Level "L" pay category.

DATED: November 30, 2012

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE